## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

KENT JERMAINE JACKSON, #318275,

        Petitioner,

v.                                   ACTION NO.
                                   2:05cv502

GENE M. JOHNSON, Director of the
Virginia Department of Corrections,

        Respondent.


## UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter was initiated by petition for writ of habeas corpus under 28 U.S.C. §2254. The matter was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia. The Court recommends denying the petition for writ of habeas corpus.


## I. STATEMENT OF THE CASE

### A. Background

On January 14, 2002, petitioner Kent Jermaine Jackson ("Jackson") was indicted on one count of capital murder, one count of robbery, one count of stabbing, cutting or wounding in the commission of a felony, one count of statutory burglary with intent to commit murder, rape or robbery, and one count of object sexual penetration. Jackson was tried before a jury in the Circuit Court of the City of Newport News from December 16 through December 20, 2002, and December

23, 2002.  The jury found him guilty of robbery, felony stabbing, statutory burglary, and capital

murder in the commission of a robbery or attempted robbery, and recommended a sentence of death

for capital murder, life imprisonment for robbery, five years imprisonment for stabbing in the

commission of a felony, and twenty years imprisonment and a fine of $100,000 for burglary.  The

trial court sentenced Jackson in accordance with the jury recommendation on March 14, 2003.

The evidence presented at trial, as summarized by the Supreme Court of Virginia,[1] showed

the following:

> On April 18, 2000, the body of Beulah Mae Kaiser, 79 years of age,
> was found in her apartment.  According to the medical examiner,
> Mrs. Kaiser died from a combination of a stab wound to her jugular
> vein, a fractured skull, and asphyxia caused by blockage of her
> airway by her tongue.  Any one of these injuries could have been
> fatal.  In addition to these injuries, Mrs. Kaiser suffered two black
> eyes, a broken nose, and multiple abrasions, lacerations, and bruises.
> She had five stab wounds to her head and neck, including the wound
> to her jugular vein.  The medical examiner also testified that Mrs.
> Kaiser had been anally sodomized with her walking cane and that the
> cane then had been driven into her mouth with such violence that it
> knocked out most of her teeth, tore her tongue and forced it into her
> airway, fractured her jaw, and penetrated the left side of her face.
>
> When Mrs. Kaiser's body was found, her apartment was in disarray.
> Personal items were strewn throughout the apartment, blood spatters
> were on the surfaces of the apartment, and the contents of Mrs.
> Kaiser's purse had been dumped on the floor.  The police were
> unable, however, to find a weapon or any fingerprints of value.
>
> The crime went unsolved for over 16 months until DNA testing of
> saliva on a cigarette butt found in the apartment implicated an
> individual named Cary Gaskins.  An interview with Gaskins led the
> police to Joseph M. Dorsett and Jackson, who had been roommates
> in an apartment across the hall from Mrs. Kaiser's apartment at the

---

[1]This summary of the facts was presented by the Virginia Supreme Court in the light
most favorable to the Commonwealth.  Jackson v. Commonwealth, 587 S.E.2d 532, 537 (Va.
2003).

time of her death.  Following an interview with Dorsett, Newport News police arrested Dorsett, charging him with Mrs. Kaiser's murder, and obtained a warrant for Jackson's arrest.

Police arrested Jackson at a girlfriend's home in King George County around 4:00 a.m. on August 29, 2001.  During an interview with Newport News police detectives at the King George County jail that afternoon, Jackson confessed to the murder of Mrs. Kaiser.

Jackson v. Commonwealth, 587 S.E.2d 532, 537-38 (Va. 2003).

The Virginia Supreme Court unanimously affirmed Jackson's convictions and death sentence on October 31, 2003, id., and denied rehearing on January 30, 2004.  The United States Supreme Court denied Jackson's petition for writ of certiorari on October 4, 2004, Jackson v. Virginia, 543 U.S. 842 (2004), and Jackson's petition for rehearing on November 29, 2004.

On June 16, 2005, the Virginia Supreme Court dismissed Jackson's petition for a writ of habeas corpus in a twenty-page order.  Jackson v. Warden, Record No. 042706 (Va. June 16, 2005). On August 8, 2005, pursuant to Virginia Code § 53.1-232.1(i), the Circuit Court of the City of Newport News conducted a hearing and scheduled Jackson's execution for September 1, 2005.

On August 17, 2005, the Virginia Supreme Court denied Jackson's motion to grant a stay of execution, which was based on his August 1, 2005, filing of a petition for writ of certiorari in the United States Supreme Court.  Then, on August 26, 2005, the United States Supreme Court denied Jackson's petition for writ of certiorari and application for stay of execution.  Jackson v. True, 126 S.Ct. 29 (U.S. 2005).

Jackson, presently in the custody of the Virginia Department of Corrections, asked this Court to stay his execution.  The Court granted his request on August 31, 2005, and subsequently ordered Jackson to file his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 by May 15, 2006, which he did.  On July 10, 2006, respondent filed a Rule 5 Answer and Motion to Dismiss.  Jackson

3

filed a response to the Motion to Dismiss on September 6, 2006.  Respondent then filed a reply to Jackson's response on September 18, 2006.

## B. <u>Grounds Alleged</u>

Jackson asserts the following entitle him to relief under 28 U.S.C. § 2254:

(a)     he was denied the effective assistance of counsel due to his counsel's failure to:

   (i)     accept the trial court's offer to replace Jackson's second court appointed attorney after he withdrew his representation;

   (ii)    adequately conduct cross-examination of the Commonwealth's DNA expert as a result of proceeding to trial without co-counsel;

   (iii)   adequately conduct direct examination of Dr. Ganderson as a result of proceeding to trial without co-counsel;

(b)     his constitutional rights were violated due to the following errors related to the indictment:

   (i)     his Fourteenth Amendment right to Due Process was denied when the Commonwealth failed to charge him under Virginia Code § 19.2-264.2 in his indictment;

   (ii)    he was denied the effective assistance of counsel due to his counsel's failure to move for dismissal of his indictment;

   (iii)   his Fourteenth Amendment right to Due Process was denied when the Commonwealth failed to notify him of the aggravating factors upon which the prosecution planned to rely to prove capital murder under Virginia Code § 18.2-31;

(c)     the Virginia Supreme Court denied his <u>Batson</u> claim based on an unreasonable application of clearly

4

established federal law and an unreasonable
determination of the facts;

(d)     his Sixth Amendment right to trial by jury was denied
when the jury was not required to unanimously agree
on which of the three elements of the § 19.2-264.2
vileness category they found in his case, and the trial
court denied Jackson's motion to have the jurors
polled to determine that they had agreed on the same
element beyond a reasonable doubt;

(e)     he was denied the effective assistance of counsel
when his trial counsel failed to object to the
comparative worth argument made by the prosecutor
during sentencing; and,

(f)     the Virginia Supreme Court erred when it ruled that:

(i)     the Virginia capital murder statutes are
constitutional; and,

(ii)    Jackson's sentence was not disproportionate
or excessive.

## II.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

In order for this Court to address the merits of this habeas petition, all of Jackson's claims

must be exhausted.  See 28 U.S.C. § 2254(b) (2000).  The exhaustion requirement is satisfied when

the "essential legal theories and factual allegations advanced in federal court . . . [are] the same as

those advanced at least once to the highest state court." Pruett v. Thompson, 771 F. Supp. 1428,

1436 (E.D.Va. 1991), aff'd, 996 F.2d 1560 (4th Cir. 1993).  Exhaustion may be accomplished either

on direct appeal or in post-conviction proceedings.  See O'Sullivan v. Boerckel, 526 U.S. 838, 844

(1999) (citing Brown v. Allen, 344 U.S. 443, 447 (1953)); see also  Skipper v. French, 130 F.3d 603,

610 n.4 (4th Cir. 1997). All of Jacksons's claims are exhausted either because they were decided by

the Virginia Supreme Court on direct appeal or on state habeas appeal, they were presented to the

Virginia Supreme Court but barred from review under state procedural rules or they never were presented to the Virginia Supreme Court and, under Virginia rules, Jackson has no further remedy in state court.

## A.  Ground (a)

In Ground (a), Jackson claims that he was denied the effective assistance of counsel when his attorney, James S.  Ellenson, declined the trial court's offer to appoint a replacement for Alfred Masters, Ellenson's co-counsel who withdrew from Jackson's case.   In support of this claim, Jackson argues in Ground (a)(i) that Ellenson's decision to represent Jackson without the assistance of another attorney "resulted in a *de facto* denial of counsel." (Pet. 45.)  Jackson asserts in Ground (a)(ii), that Ellenson's decision to proceed alone resulted in his inadequately conducting cross-examination of the Commonwealth's DNA expert.   In Ground (a)(iii), Jackson alleges that Ellenson's decision to try his case without assistance also resulted in a direct examination of his expert, Dr. Ganderson, that fell "outside the range of professional competence." (Pet. 46.)

Jackson, who was indicted on January 14, 2002, was represented by two defense attorneys until October 10, 2002, when the Circuit Court of the City of Newport News granted Masters's motion to withdraw.   In his Motion to Withdraw and Notice of Hearing, Masters requested that replacement counsel be substituted to assist Ellenson. (Notice of Hearing 1, October 9, 2002.) When the court asked Ellenson whether he had someone in mind to serve as co-counsel, however, Ellenson responded that he did not, and declined the court's offer to appoint replacement counsel. (J.A. 327.) He explained that, though Masters had done a significant amount of work on the technical aspects of the case, Masters agreed to provide Ellenson with all relevant work product. (J.A. 327.)  After Jackson voiced his agreement with Ellenson's decision to represent him without co-counsel, the

6

court announced that it would appoint another attorney should Jackson or Ellenson find it necessary. (J.A. 327.)  On December 16, 2002, Jackson's trial began with Ellenson serving as his lone attorney.

1.      **Ground (a)(i)**

Jackson's Ground (a)(i), asserting that he received ineffective assistance of counsel due to Ellenson's decision to represent him without co-counsel, which Jackson argues effectively resulted in the complete denial of counsel, was asserted to the Virginia Supreme Court in his petition for a writ of habeas corpus.  Because the Virginia Supreme Court adjudicated the claim on the merits, this Court may only grant relief if the Virginia Supreme Court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding."  28 U.S.C. § 2254(d)(1)-(2).

The instant ground for habeas relief is a combination of Jackson's claims I(A) and I(B) presented to the Virginia Supreme Court.  To succeed on his claim, Jackson must show that the Virginia Supreme Court's disposition of his claims I(A) and I(B) constituted an unreasonable application of the standard for ineffective assistance of counsel established in Strickland v. Washington, 466 U.S. 668 (1984).  Strickland requires the Virginia Supreme Court to analyze Jackson's claims under a two-prong test: competence and prejudice.  To have granted relief, the Virginia Supreme Court would have to have found that (1) Jackson's lawyer's performance fell below the range of competence demanded of lawyers in criminal cases, Strickland, 466 U.S. at 690 (the "competence prong" of the test); and (2) there is a reasonable probability that but for the deficient performance by counsel, the ultimate result would have been different. Strickland, 466 U.S. at 694 (the "prejudice prong" of the test).  Further, the Court must "indulge a strong

presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689.

Jackson now argues that he was "deprived of a second attorney's ideas, intellect, and trial skills as he fought to avoid the death penalty," (Pet. 45) and his "sole attorney failed miserably in mounting a vigorous defense to the Commonwealth's evidence." (Pet. 47.)  Supporting his claim, Jackson asserts that the Virginia Assembly's 2004 amendment to the Virginia Code recognized the need for the appointment of at least two attorneys in capital cases.[2]  In Ground (a)(i), he has not pointed to specific instances in which Ellenson's performance fell below the range of competence demanded of lawyers in criminal cases, however, nor has he attempted to show that there is a reasonable probability that the ultimate result would have been different had additional counsel been appointed.  See Strickland, 466 U.S. at 690, 694.  Instead, Jackson notes that where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, [] there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." United States v. Cronic, 466 U.S. 648, 659 (1984).  Without substantiating his assertion, Jackson claims his trial counsel failed to subject the Commonwealth's case to meaningful adversarial testing.

---

[2]In 2002, when Jackson was tried and convicted of the instant offenses, the Virginia Code provided that "[i]n any case in which an indigent defendant is charged with a capital offense, the judge of the circuit court, upon request for the appointment of counsel, shall appoint one or more attorneys . . . to represent the defendant at trial . . . ."  Va. Code  § 19.2-163.7 (emphasis added). The statute was amended in 2004 to read, "In any case in which an indigent defendant is charged with a capital offense, the judge of the circuit court, upon request for the appointment of counsel, shall appoint at least two attorneys . . . to represent the defendant at trial . . . ."  Va. Code § 19.2-163.7 (emphasis added).  Significantly, the Sixth Amendment's guarantee of counsel has never been interpreted to require the appointment of more than one lawyer to an indigent criminal defendant.  See Gideon v. Wainwright, 372 U.S. 335 (1963) (holding that the Sixth and Fourteenth amendments provide indigent defendants in criminal prosecutions the right to have counsel appointed to them).

Though Jackson correctly asserts that prejudice is presumed where a petitioner has been actually or constructively denied the assistance of counsel, See Strickland, 466 U.S. at 692, he has failed to show that representation by one, instead of two attorneys, resulted in the constructive denial of his right to the assistance of counsel.

Because Jackson has failed to demonstrate that counsel's performance was deficient, the Virginia Supreme Court's denial of the instant claim of ineffective assistance of counsel was not contrary to, and did not involve an unreasonable application of, clearly established federal law. Therefore, this Court recommends that Ground (a)(i) should be DENIED.

### 2.      Ground (a)(ii)

In Ground (a)(ii) Jackson claims, for the first time, that counsel was ineffective for failing to adequately cross-examine the Commonwealth's DNA expert.   Because Jackson has never presented this ineffective assistance of counsel claim to the Virginia state courts, it is procedurally defaulted and this Court is precluded from addressing the merits of the claim.  28 U.S.C. § 2254(b) (2000).

"In the interest of giving state courts the first opportunity to consider alleged constitutional errors occurring in a defendant's state trial and sentencing, a state prisoner must 'exhaust' all available state remedies before he can apply for federal habeas relief." Fisher v. Angelone, 163 F.3d 835, 851 (4th Cir. 1998) (internal quotation and citation omitted).  A petitioner exhausts state remedies by presenting the substance of his claim to the state's highest court. See id. "A procedural default occurs when a habeas petitioner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'"  Id. (citing Coleman v. Thompson,

9

501 U.S. 722, 735  n.1 (1991)).

Jackson failed to present the substance of Ground (a)(ii) to the Virginia Supreme Court. Therefore, he has not satisfied the exhaustion requirement.   Significantly, the Virginia Supreme Court would now find the claim procedurally barred pursuant to Section 8.01-654(B)(2) of the Virginia Code, which bars petitioners from "raising any claim in a successive petition if the facts as to that claim were either known or available to petitioner at the time of his original petition." Accordingly, Jackson's Ground (a)(ii) is procedurally defaulted.

Procedural default may be excused, however, if the petitioner "can demonstrate cause for, and resulting prejudice from, the default, or that he has suffered a fundamental miscarriage of justice." Fisher, 163 F.3d at 852; see also Wainwright v. Sykes, 433 U.S. 72, 87-91 (1977). Nowhere in his federal petition has Jackson shown the requisite cause and prejudice that this Court must find before considering the merits of the claim.   Therefore, this Court finds that Ground (a)(ii) is defaulted on federal habeas and will not address the merits.

### 3.      Ground (a)(iii)

Jackson's Ground (a)(iii) alleges that counsel was ineffective for failing to adequately conduct direct examination of Dr. Ganderson.  The substance of Ground (a)(iii), raised by Jackson as Claim VI in his state habeas petition, was denied by the Virginia Supreme Court on the merits.

Specifically, the Virginia Supreme Court held that Jackson had not proven that cousnel's decision not to use Dr. Ganderson as an expert at the conclusion of voir dire did not constitute deficient performance and did not result in prejudice under the Strickland standard.  See Jackson v. Warden, No. 042706, op. at 4 (Va. June 16, 2005).  Instead, the court explained, counsel decided not to use Dr. Ganderson as an expert witness because "the Commonwealth was prepared to rebut

Dr. Ganderson's testimony by presenting the testimony of Dr. Don Killian who had examined the petitioner.  Trial counsel's decision was . . . a tactical decision that not calling Dr. Ganderson would bar Dr. Killian's 'contrary testimony.'" Id.

Jackson now claims that his counsel "did not appear to know exactly what he wanted Dr. Ganderson to testify about" and that counsel did not "have an understanding of the case law and rules of evidence regarding expert testimony" (Pet. 46.)  The record, however, does not support his contention.  Counsel's questioning throughout the voir dire of Dr. Ganderson was carefully crafted in an attempt to qualify Dr. Ganderson as an expert to testify about specific topics without opening the door to Dr. Killian's rebuttal testimony, which counsel believed would be damaging to Jackson's case.  This exact predicament was explained to the court, outside the presence of the jury, in the following exchange[3]:

> MR. ELLENSON:     Where we're at, since we're outside of the jury, Doctor Ganderson examined Kent Jackson.  Subsequent to that, Doctor Killian examined Kent Jackson, and to a certain extent the findings would not – would conflict we think.
> MR. DANIELSON:    It is the Commonwealth's intention if Doctor Ganderson testifies to bring Doctor Killian, who was requested by the Defense to look at the defendant, to testify as to his findings.  Mr. Ellenson is trying to find a way to have Ganderson testify on the stand, yet without the Commonwealth's being able to bring Doctor Killian up.  I don't see how you can sanitize it.
> MR. ELLENSON:     That's what I'm trying to do.
> THE COURT:          I understand.

(Tr. 696.)

The questioning following that exchange continued to be frustrated by counsel's strategy to limit the scope of Dr. Ganderson's testimony to preclude the Commonwealth from eliciting

---

[3]"MR DANIELSON" is the prosecutor.

11

testimony from Dr. Killian regarding his observations of Jackson.  After Dr. Ganderson testified that

he is not an expert on false confessions (Tr. 681), counsel attempted to persuade the court that Dr.

Ganderson should be permitted to offer expert testimony about the veracity of Jackson's confession.

The court ultimately prohibited Dr. Ganderson from testifying as to whether Jackson's confession

was reliable, but allowed counsel to question Dr. Ganderson about the physical and psychological

environment surrounding the confession (Tr. 703-04).  At this point, counsel was confronted with

deciding whether presenting Dr. Ganderson's testimony regarding the psychological environment

surrounding Jackson's confession[4] was worth risking opening the door to Dr. Killian's potentially

damaging testimony.  Counsel was explicit that, from a strategy standpoint, the risk was not worth

taking:

> MR. ELLENSON:    Judge, I'm not going to call Doctor
> Ganderson, and it's – again, I'll just state this for the record.  It's
> really a question of trial strategy because I believe given the way that
> eventually this examination is going to have to be conducted, and
> given what I believe eventually is going to have to come in, given the
> strictures that are being placed, that I don't see how through cross-
> examination, and then Doctor Killian – Doctor Killian won't come
> on.  So I'm not going to call Doctor Ganderson.

(Tr. 708.)

Under the highly deferential standard established in <u>Strickland</u>, it has long been settled that

federal habeas courts are to "eliminate the distorting effects of hindsight" by requiring habeas

petitioners to "overcome the presumption that, under the circumstances, the challenged action might

be considered sound trial strategy." <u>Strickland</u>, 466 U.S. at 689 (internal quotations and citation

---

[4]Counsel stated, and the court agreed, that Jackson had independent evidence of the physical environment.  Therefore, Dr. Ganderson's testimony would be necessary only to establish the psychological environment. (Tr. 704-05.)

omitted).   Counsel's decision whether to call a witness who would likely open the door to evidence unfavorable to Jackson's defense is exactly the type of trial strategy the Court intended to leave to the discretion of counsel.   Jackson has not overcome the presumption that counsel's strategy was not sound, or that he was prejudiced because of it.   Accordingly, the Virginia Supreme Court's application of <u>Strickland</u> was not unreasonable, and this court recommends DENYING Jackson's Ground (a)(iii).

## B.  <u>Ground (b)(i)</u>

In Ground (b)(i), Jackson alleges that his Fourteenth Amendment right to due process was denied when the Commonwealth failed to charge him under Virginia Code § 19.2-264.2, "conditions for imposition of death sentence," in his indictment.   He argues that "[c]apital murder, under 18.2-31 by itself, is not a death eligible offense," and that "a finding under § 19.2-264.2 is required to transform capital murder into a death eligible capital offense." (Pet. 47.)   Jackson's indictment charged him with a violation of Virginia Code § 18.2-31 for the willful, deliberate, and premeditated killing of a person in the commission of robbery or attempted robbery.   It did not, however, charge him under § 19.2-264.2.   Because his indictment did not charge him under § 19.2-264.2, Jackson argues, he did not have notice of the elements against which he had to defend, which violates his right to due process.

In denying his state habeas petition, the Virginia Supreme Court held that the

> failure to include aggravating factors in an indictment is not a jurisdictional defect and is waived by the failure to object to the indictment before trial.  <u>Wolfe v. Commonwealth</u>, 265 Va. 193, 223-24, 576 S.E.2d 471, 488-89 (2003); Rule 3A:9(b), (c).   The Court holds that this portion of claim (II) is procedurally defaulted because this non-jurisdictional issue could have been raised at trial and on direct appeal and, thus, is not cognizable in a petition for a writ of habeas corpus.  <u>Parrigan</u>, 215 Va. at 209, 205 S.E.2d at 682.

13

<u>Jackson v. Warden</u>, No. 042706, op. at 4 (Va. June 16, 2005).

Clearly the Virginia Supreme Court's refusal to hear these claims rested squarely on the state procedural bar provided in the Rules of the Supreme Court of Virginia and <u>Slayton v. Parrigan</u>. There was no interweaving of any federal law within Virginia's refusal to consider Jackson's claims. The Fourth Circuit has held, that "[a]bsent cause and prejudice or a miscarriage of justice, a federal court sitting in habeas may not review a constitutional claim when a state court has declined to consider its merits on the basis of an adequate and independent state procedural rule." <u>Mu'Min v. Pruett</u>, 125 F.3d 192, 196-97 (4th Cir. 1997) (internal citations omitted). There is no cause, prejudice, or miscarriage of justice alleged by Jackson or apparent to this Court. Therefore, this Court cannot now review claims that were procedurally defaulted in the Virginia Supreme Court. Accordingly, this Court recommends DENYING Jackson's Ground (b)(i).

### C.  <u>Ground (b)(ii)</u>

Jackson asserts in Ground (b)(ii) that his counsel was ineffective for failing to move for dismissal of his indictment, at least as to the death penalty, for its failure to reference § 19.2-264.2. Jackson argues that counsel was ineffective for failing to move for dismissal since, according to <u>Jones v. U.S.</u>, 526 U.S. 227 (1999) and <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), a "charging document must contain all of the elements that are to be proved to establish the maximum available punishment." (Pet. 52.) Additionally, he argues that Jackson was prejudiced by having to prepare a defense without knowledge of all of the elements charged.

It is true that "[u]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any factor (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven

14

beyond a reasonable doubt." <u>Jones</u>, 526 U.S. at 243 n. 6. However, the Fourteenth Amendment has never been construed to require State governments to provide their citizens the Fifth Amendment right to presentment of indictment or a Grand Jury. See <u>Apprendi</u>, 530 U.S. at 477 n. 3 (explaining that the petitioner did not assert a constitutional claim based on the omission of any reference to the sentence enhancement of racial bias in his indictment for state charges). Because the <u>Jones</u> rule is not applicable to state proceedings to the extent that it concerns the Fifth Amendment, argument by counsel for dismissal of the indictment for failure to follow the rule would have been frivolous. Counsel's performance was, therefore, not deficient, and the Virginia Supreme Court's application of <u>Strickland</u> was reasonable. Therefore, this Court recommends DENYING Ground (b)(ii).

### D. <u>Ground (b)(iii)</u>

In Ground (b)(iii), Jackson claims that his Sixth and Fourteenth Amendment rights were violated when the Circuit Court of the City of Newport News denied his motion for a bill of particulars notifying him "of what, if any, elements the prosecution intended to prove when seeking the death penalty." (Pet. 53.) Jackson argues that the circuit court's denial of his motion violated his Sixth Amendment right to be informed of the nature and cause of the accusation against him.

Indeed, the Sixth Amendment entitles a defendant to be informed of the nature and cause of the accusation against him. <u>Wong Tai v. U.S.</u>, 273 U.S. 77, 80 (1927). Indicted under Section 18.2-31 of the Virginia Code, Jackson was on notice that the nature and cause of the accusation against him included "[t]he willful, deliberate and premeditated killing of any person in the commission of" either "robbery or attempted robbery" or "rape or attempted rape, forcible sodomy or attempted

forcible sodomy or object sexual penetration."[5]  Jackson claims the Commonwealth did not notify

him of the so-called "aggravators" - the factors listed under Section 19.2-264.2[6] of the Virginia Code

- on which it intended to rely.   In opposing Jackson's motion for a bill of particulars, the

Commonwealth notified Jackson that it "may rely on all of these factors." (J.A. 241.)

According to Rule 7(f) of the Federal Rules of Criminal Procedure, "[t]he court *may* direct

the government to issue a bill of particulars." (emphasis added).  Moreover, the decision to direct

the government to issue a bill of particulars is within the court's discretion.  See Wong Tai, 273 U.S.

at 82.  Significantly, issuance of a bill of particulars is not constitutionally required under any

circumstance.

Because Jackson was on notice of the nature and character of the accusations against which

he was required to defend, as well the "aggravating" factors the Commonwealth intended to prove,

the Virginia Supreme Court's denial of his appeal from the trial court's denial of his motion for a

bill of particulars was not contrary to, nor did it involve an unreasonable application of, federal law.

Accordingly, the Court recommends DENYING Jackson's Ground (b)(iii).

## E.  **Ground (c)**

_____  In Ground (c), Jackson claims that the Virginia Supreme Court denied his Batson claim

based on an unreasonable application of clearly established law and an unreasonable determination

---

[5]In addition to his charge for capital murder, Jackson was indicted on, among other things, one count of robbery and one count of object sexual penetration.

[6]These factors include "a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society or that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim." Va. Code § 19.2-264.2 (2004).

16

of the facts.  Specifically, he asserts that the Virginia Supreme Court unreasonably applied clearly established federal law when it failed to consider whether the Commonwealth applied its race-neutral reasons for striking black venire members equally to white jurors.  Further, Jackson claims that the Virginia Supreme Court was unreasonable in finding as a fact that the Commonwealth provided race-neutral grounds for using its peremptory strikes to exclude black venire members Vento Carter, Christopher Sledge, Geraldine Thomas, and Amy Legett.

In response, the Director claims that Jackson's Batson claim is not exhausted, precluding this Court from considering it, since Jackson did not assert at trial or on appeal that the Commonwealth's stated race-neutral grounds for striking the black venire members at issue were pretextual.  The respondent further argues that granting Jackson relief would require this Court to announce a "new rule," which is prohibited under Saffle v. Parks, 494 U.S. 484, 488 (1990).

### 1.    The Batson Standard

The Supreme Court first recognized that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant" in Batson v. Kentucky, 476 U.S. 79, 89 (1986).  In its opinion, the Court established the following burden-shifting paradigm through which defendants could prove purposeful discrimination in selection of the petit jury.  First, the defendant must establish a prima facie case of purposeful discrimination in the jury selection.  Id. at 96.  "Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors."  Id. at 97.  Finally, "[t]he trial court then will have the duty to determine if the defendant has established purposeful discrimination."  Id. at 98.

17

### 2.      Exhaustion

The respondent contends that this Court is prohibited from considering the merits of Jackson's <u>Batson</u> claim because he did not assert the disparate treatment theory to the state courts. Jackson's trial counsel raised a <u>Batson</u> motion after the Commonwealth used each of its peremptory strikes to exclude black venire members.   In so doing, Jackson's counsel argued that it was "incumbent on the Commonwealth . . . to offer race-neutral reasons why they were struck." (Tr. 333.)  In response, the court stated "[t]hat's correct," (Tr. 333.) and the Commonwealth proceeded to offer race-neutral reasons for striking each juror.  (Tr. 333-35.)  Satisfied that the stated reasons were race-neutral, the court then gave Jackson's counsel opportunity to respond.  At that point, counsel said, "I would submit it for your decision, Judge." (Tr. 336.)  At the conclusion of argument, the court held that there "[d]oesn't seem to be any reason to say that the Commonwealth struck based upon race." (Tr. 336.)  Jackson's counsel responded by noting his exception to the court's ruling.  (Tr. 336.)

Jackson again raised his <u>Batson</u> challenge on direct appeal, stating in his brief to the Virginia Supreme Court that the Commonwealth's "proffered reasons for striking black jurors were not race neutral and were thus constitutionally impermissible." (Appellant's Va.S.Ct. Br. at 51-52.)  The Commonwealth's response re-stated the race-neutral grounds it argued at trial for each strike. (Appellee's Va.S.Ct. Br. at 24-25.)  Based on its review of the record, the Virginia Supreme Court concluded "that the trial court's ruling on Jackson's <u>Batson</u> challenge was not clearly erroneous." <u>Jackson v. Commonwealth</u>, 587 S.E.2d 532, 543 (2003).

Because Jackson presented the substance of his <u>Batson</u> challenge to the highest state court on direct appeal, he has met the exhaustion requirement and has properly raised his <u>Batson</u> claim

18

for federal habeas review.  See Fisher, 163 F.3d at 851.  The identical argument for procedural

default now raised by the Commonwealth was rejected by the Supreme Court of the United States

in Miller-El v. Dretke, 545 U.S. 231, 241 n.2 (2005) ("Miller-El II").  There, the Supreme Court was

reviewing the District Court for the Northern District of Texas's denial of a petition for habeas

corpus in which the petitioner claimed the trial court engaged in an unreasonable determination of

the facts when it found that the prosecutor's race-neutral explanations for striking black jurors were

true.  Id. at 240.  Although Miller-El raised his Batson challenge on state appeal by presenting

evidence showing that the district attorney's office prosecuting the case had an "unofficial policy"

of excluding blacks from jury service, he did not argue that, based on evidence that the state retained

for jury service white jurors who provided responses similar to stricken black venire members, the

prosecutor's race-neutral reasons for striking certain black venire members were pretextual.[7]  For

that reason, the dissent in Miller-El II argued that AEDPA does not permit habeas petitioners to

"sandbag" state courts by producing evidence and arguing theories in federal habeas proceedings

that were not raised before the state court.  Id. at 279 (Thomas, J., dissenting).  Continuing, Justice

Thomas explained that

> Miller-El did not argue disparate treatment or disparate questioning
> at the *Batson* hearing, so he had no reason to submit the juror
> questionaires or cards to the trial court.  However, Miller-El could
> have developed and presented all of that evidence at the *Batson*
> hearing.  Consequently, he must satisfy § 2254(e)(2)'s requirements
> to adduce the evidence in federal court - something he cannot do.

---

[7]In addition to this theory supporting Miller-El's Batson challenge, he also asserted the
following theories: that the prosecution  used the "jury shuffle" in a racially discriminatory way;
that the prosection used a "graphic script" of questions on a higher proportion of black venire
members than white venire members, evidencing an intent to exclude black venire members;
and, that the prosecution engaged in "trickery" in questioning black venire members on the
minimum sentence they would consider imposing for murder.  Miller-El II, 545 U.S. at 253-262.

Id. (internal citation omitted).

Responding to the dissent's concerns, the majority stated

> The dissent contends that comparisons of black and nonblack venire panelists, along with Miller-El's arguments about the prosecution's disparate questioning of black and nonblack panelists and its use of jury shuffles, are not properly before this Court, not having been "put before the Texas courts." *Post*, at 2347 (THOMAS, J.).  But the dissent conflates the difference between evidence that must be presented to the state courts to be considered by federal courts in habeas proceedings and theories about that evidence.  See 28 U.S.C. § 2254(d)(2) (state court factfinding must be assessed "in light of the evidence presented in the State court proceeding"); *Miller-El v. Cockrell*, 537 U.S. 322, 348, 123 S.Ct. 1029, 254 L.E.2d 931 (2003) (habeas petitioner must show unreasonability "in light of the record before the [state] court").  There can be no question that the transcript of voir dire, recording the evidence on which Miller-El bases his arguments and on which we base our result, was before the state courts, nor does the dissent contend that Miller-El did not "fairly presen[t]" his *Batson* claim to the state courts.  *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.d.2d 438 (1971).

Id. at 241, n. 2.  Accordingly, the majority considered Miller-El's new theories supporting his Batson claim and granted him relief.  Id. at 265-66.

Like Miller-El, Jackson fairly presented his Batson claim to the state courts.  That he now presents a new theory to support his claim is inapposite.  As the Miller-El II majority noted, there is a "difference between evidence that must be presented to the state courts to be considered by federal courts in habeas proceedings and theories about that evidence."  Id. at 241 n.2.  Because Jackson relies on the same evidence he produced in the Virginia courts in pursuing his instant disparate treatment theory in support of his Batson challenge, his argument and the evidence are both properly before this Court.  See id.

### 3.    New Rule

The Director next asserts that granting Jackson relief would require this Court to announce

a "new rule" on collateral review, which is prohibited under <u>Saffle v. Parks</u>, 494 U.S. 484, 488 (1990). A new rule is a rule that "breaks new ground or imposes a new obligation on the States or Federal Government." <u>Teague v. Lane</u>, 489 U.S. 288, 301 (1998). Put differently, "a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." <u>Id.</u> (emphasis in original). Unless the new rule comes within one of two exceptions that do not apply in this case, the court conducting collateral review of a final conviction is prohibited from applying the rule. <u>See</u> <u>Penry v. Lynaugh</u>, 492, U.S. 302 (1989).

The Director does not contend that the Supreme Court's holding in <u>Miller-El II</u>, which was decided after Jackson's conviction became final, is a new rule of constitutional law that may not now be applied to Jackson's habeas case. Instead, the Director asserts that Jackson asks this Court to announce a new rule of constitutional law by applying that "rule" during <u>Batson</u>'s second step. The "rule" at issue is the Supreme Court's interpretation of <u>Batson</u> in <u>Miller-El II</u> , which it held provided for comparative juror analysis to prove purposeful discrimination during <u>Batson</u>'s third step. <u>Miller-El II</u>, 545 U.S. at 241.

The Director's argument misconstrues Jackson's claim. With respect to his <u>Batson</u> challenge, Jackson plainly states that "[t]he question that remains is whether the trial court erred in accepting, without analysis, the Commonwealth's explanation for its systematic use of peremptory challenges to exclude black jurors . . . ." (Pet. 57.) The analysis that Jackson argues should have occurred at that point - which is <u>Batson</u>'s third-step - is a comparative analysis of the questions asked of, and responses given from, black venire members and white jurors. Jackson's <u>Batson</u> claim is not, therefore, an "invitation to announce a 'new rule' in his case on collateral review." (Resp. Mot. to Dismiss 21.) Rather, it is a valid claim based on <u>Miller-El II</u>'s illustration of the means by

21

which a petitioner can establish a <u>Batson</u> error.  <u>See</u> <u>Miller-El II</u>, 545 U.S. at 241; <u>see also</u> <u>Murphy</u>
<u>v. Dretke</u>, 416 F.3d 427, 439 (5th Cir. 2005) ("the [*Miller-El II*] Court considered the type and
quantum of record evidence required to demonstrate a *Batson* violation.  The Court did not announce
any new elements or criteria for determining a *Batson* claim . . . ."); <u>Boyd v. Newland</u>, 467 F.3d
1139, 1146 (9th Cir. 2006) ("Neither does *Miller-El II* create a new rule of criminal procedure.
Instead, it simply illustrates the means by which a petitioner can establish, and should be allowed
to establish, a *Batson* error.").

The Director's claim that Jackson is precluded from challenging the trial court's
determination at <u>Batson</u>'s third step because Jackson did not pursue the third step at trial is also
without merit.  Jackson's trial counsel raised his <u>Batson</u> challenge by advising the court that each
of the Commonwealth's peremptory challenges was used to strike a black venire-member.  In
making his prima facie case of purposeful discrimination, counsel satisfied <u>Batson</u>'s first step.  Next,
the government offered race-neutral reasons for each strike, which is the second <u>Batson</u> step.  During
the third <u>Batson</u> step, the trial court has "the duty to determine if the defendant has established
purposeful discrimination."  <u>Batson</u>, 476 U.S. at 98.  Significantly, the third step does not require,
as the Director contends, that the defendant assert "that the reasons offered were pretextual." (Resp.
Mot. to Dismiss 21.)   Accordingly, after Jackson's counsel established a prima facie case of
purposeful discrimination, and the Commonwealth responded by offering race-neutral reasons for
striking the particular venire-members, the trial court completed the third <u>Batson</u> step by ruling that
there did not "seem to be any reason to say that the Commonwealth struck based upon race." (Tr.
336.)

    **4.**    **Jackson's <u>Batson</u> Claim**

Jackson alleges that the Virginia Supreme Court unreasonably applied clearly established federal law when it failed to consider whether the Commonwealth applied its race-neutral reasons for striking black venire members equally to white jurors.  Under the highly deferential standard established by 28 U.S.C. § 2254(d), this Court can grant relief on the merits of a constitutional claim only if the Virginia Supreme Court "arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 413 (2000).  Federal habeas relief is also appropriate when "the state court identifies the correct governing legal principle from [the United States Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case."  Id.

In the instant case, the Virginia Supreme Court identified the correct governing legal principle - Batson - and reasonably applied it.  Pursuant to Batson, the Virginia Supreme Court recited and evaluated the Commonwealth's race-neutral reasons offered at Batson's third step, noted Jackson's counsel's failure to produce evidence or argue that the reasons were pretextual, and in consideration of all of the evidence and argument before it, found that the trial court's determination that the Commonwealth's reasons were credible was not clearly erroneous.  Jackson, 587 S.E.2d at 545-46.  In short, the Virginia Supreme Court applied Batson exactly as intended.  Because the Virginia Supreme Court evaluated the persuasiveness of the Commonwealth's race-neutral reasons in light of the evidence before it, its application of Batson to the facts of Jackson's case was not unreasonable.

Jackson also contends that the Virginia Supreme Court unreasonably determined the facts when it found that the Commonwealth provided race-neutral grounds for using its peremptory strikes

to exclude black venire members Vento Carter, Christopher Sledge, Geraldine Thomas, and Amy Legett.  Jackson may obtain relief only by showing the Virginia Supreme Court's conclusion to be "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  Thus, the state court's factual findings are presumed to be sound unless Jackson rebuts the "presumption of correctness by clear and convincing evidence." § 2254(e)(1).  See Miller-El II, 545 U.S. at 240.

Jackson argues that "[t]he fact that the supposed 'reasons' for the Commonwealth's strikes of black jurors applied with equal or greater force to white jurors who were not struck demonstrates that the Commonwealth struck black jurors in whole or in part on the basis of their race." (Pet. 68.) Jackson reaches this conclusion after developing a comparative analysis in which responses elicited from the stricken black venire members are compared to those elicited from white jurors.  He argues that this comparative analysis demonstrates a pattern in which the Commonwealth struck black venire members who offered ambivalent responses or wavering positions on the death penalty while retaining for jury service white members who offered similar responses.

Jackson has not presented clear and convincing evidence rebutting the presumption of correctness afforded the Virginia Supreme Court's factual findings.  At best, Jackson's comparative analysis presents a close call.  See Miller-El II, 545 U.S. at 252, n.11 (calling the petitioner's claim that black venire members who were struck for "ambivalence" while white jurors were arguably more ambivalent "a closer call" with respect to a determination of purposeful discrimination). Though the record reflects that some white jurors expressed ambivalence toward the death penalty

similar to that expressed by stricken black venire members,[8] the Virginia Supreme Court was reasonable in deferring to the findings of the trial court, which "has the unique opportunity to observe the demeanor and credibility of potential jurors during *voir dire*, and the record supports the Commonwealth's characterization of the statements made by the potential jurors." Jackson, 587 S.E.2d at 437.   See Miller-El v. Cockrell, 537 U.S. 322, 339 (2003) (explaining that the persuasiveness of the prosecutor's race-neutral justification turns on the prosecutor's credibility, as measured by her demeanor, the reasonableness or improbability of the justification, or whether the rationale has basis in accepted trial strategy).

Moreover, the evidence of pretext presented by Jackson pales in comparison to the evidence presented in Miller-El II, on which Jackson relies.  In that case, the Supreme Court held that the state court's factual findings as to the nonpretextual nature of the state's race-neutral explanations for its use of peremptory challenges to excuse ten of eleven black venirepersons were shown to be wrong and unreasonable by clear and convincing evidence.  Miller-El II, 545 U.S. at 266.  Significantly, the Court's decision was based on much more than venire member response comparisons.  In addition to the response comparisons, the Court found significant  the prosecution's practices of "shuffling" the venire panel, asking emotionally charged questions primarily of minority panel members, asking minority members misleading questions about minimum acceptable sentences, and "widely known evidence of the general policy of the Dallas County District Attorney's Office to

---

[8]White juror Jane Costa, for instance, expressed personal opposition toward the death penalty, only to change her position by stating that there might be circumstances in which she would be able to vote for capital punishment. (J.A. 551-52.)  This is remarkably similar to stricken black venire member Christopher Sledge's statement that he would not want to make the sentencing decision, but, if selected to the jury, he could vote for the death penalty if the facts and law supported it. (J.A. 596.)

exclude black venire members . . . ." Id. at 253.  The Court explicitly stated that when the evidence "is viewed cumulatively its direction is too powerful to conclude anything but discrimination." Id. at 265.  Jackson, on the other hand, has not produced any evidence, aside from his comparison of venire member responses, to rebut the presumption of correctness attributed to the Virginia Supreme Court's finding that the Commonwealth's race-neutral reasons were not pretextual.

Jackson's comparative response evidence is also not as persuasive as Miller-El's.  Each of the venire members Jackson claims was stricken in violation of Batson actually expressed reluctance in imposing the death penalty.  By contrast, the two venire members found to have been stricken in violation of Batson in Miller-El II expressed willingness to impose the death penalty and were characterized by the Court as "ostensibly acceptable to prosecutors seeking a death verdict." Miller-El, 545 U.S. at 265.  In fact, one of them was said to be an ideal juror for the prosecution since he "expressed unwavering support for the death penalty." Id. at 242.

In sum, Jackson has not presented clear and convincing evidence to rebut the presumption that the Virginia Supreme Court's determination of the facts was correct.  Accordingly, this Court recommends DENYING Ground (c).

## F.  Ground (d)

The jury in Jackson's case found that the capital murder of Mrs. Kaiser was "vile" under § 19.2-264.2, making his offense death eligible.  There are three separate categories of vileness: torture, depravity of mind, and aggravated battery.  Under § 19.2-264.2, jurors must find at least one of these three categories of vileness beyond a reasonable doubt to elevate the violation of § 18.2-31 to a death eligible offense.  In Ground (d), Jackson alleges his Due Process rights were violated when the trial court failed to require the jurors to unanimously agree on which of the categories of

vileness they found.  Jackson also claims his rights were violated when the trial court denied a pre-

trial motion to have the jurors polled, if they recommended death under this section, to ensure there

was unanimous agreement on each of the elements.

Jackson correctly notes that jurors must be unanimous on all elements of an offense in order

to convict a defendant of that offense.  In Re Winship, 397 U.S. 358 (1970).  The question becomes

whether torture, depravity of mind, or aggravated battery are elements.  The Supreme Court's most

recent discussion of what constitutes an element of an offense can be found in Richardson v. United

States, 526 U.S. 813 (1999).  The issue in Richardson was whether the continuing criminal

enterprise statute, which requires that a defendant's violation of federal drug laws be part of a "series

of violations", created a single element, a "series,"or whether each violation constituting the series

was a separate element of the offense.  Id. at 818.  If the "series" was a single element in which

individual violations were but the means, the jury need only agree that the defendant committed at

least three of all of the underlying crimes proven by the government.  Id.  If the statute made each

violation a separate element that must be proven beyond a reasonable doubt, the jury must agree

unanimously about which three crimes the defendant committed.  Id. at 818.  Before announcing its

decision, the court explained that while a jury must unanimously agree on all elements of an offense,

a jury need not always decide unanimously which of several possible means the defendant used to

commit the element.  Id. at 817.  Ultimately, the Court held that to avoid punishing the defendant

for underlying crimes without any fact-finder having found the defendant committed those crimes,

each of the violations constituting the "series" must be considered a separate element and proven

beyond a reasonable doubt.  Id. at 822.  Jackson argues the same reasoning should apply to his case,

and the jurors must be unanimous as to which category of vileness they found.

Jackson also relies upon the Supreme Court's holding that "where a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact - no matter how the State labels it - must be found by a jury beyond a reasonable doubt." Ring v. Arizona, 536 U.S. 584, 602 (2002) (citing Apprendi v. New Jersey, 530 U.S. 466, 482-83 (2000)).  In Ring, the court held that aggravating factors, which, if found, can expose the defendant to the death penalty, are the equivalent of an element of a greater offense. 536 U.S. at 609.  Therefore, the Sixth Amendment requires that the aggravating factor be found by a jury beyond a reasonable doubt.  Id.

While the jury did find beyond a reasonable doubt that Jackson's capital murder of Ms. Kaiser was vile, the jurors did not indicate which category of vileness they found.  Therefore, Jackson argues there is no way of knowing whether the jury unanimously agreed upon the same category of vileness, and it cannot be said that he was found guilty of every element beyond a reasonable doubt.  The Virginia Supreme Court rejected his argument, stating the following:

> [i]n a pre-trial motion, Jackson asked that, if the jury imposed the death sentence based on the aggravating factor of vileness, the jury be polled as to "which statutory element(s) established vileness, specifying at the time of polling one or more of torture, depravity of mind or aggravated battery." To that end, Jackson requested jury instructions and a verdict form that required unanimity on one or more vileness elements.  Relying on Richardson v. United States, 526 U.S. 813, 119 S. Ct. 1707, 143 L.Ed2d 985 (1999), Jackson argues that when imposing the death sentence, due process requires unanimity not only as to the aggravating factor of vileness but also to one or more of its composite elements.

> This Court has rejected the proposition that the jury must identify the element or elements of the vileness factor upon which it based its decision.  Clark v. Commonwealth, 220 Va. 201, 213, 257 S.E.2d 784, 791 (1979). The Supreme Court's decision in Richardson does not require us to revisit our decision in Clark.

> . . .

> The Supreme Court explained in <u>Richardson</u> that, for example, the jury must unanimously find force as an element of the crime of robbery, but whether the force is created by the use of a gun or a knife is not an element of the crime and therefore does not require jury unanimity. <u>Id.</u> at 817, 119 S.Ct. 1707.  In this case, the element the jury was required to find unanimously to impose the death sentence was the aggravating factor of vileness, which requires the defendant's actions be "outrageously or wantonly vile, horrible or inhuman."  Code § 19.2-264.2.  Depravity of mind, aggravated battery, and torture are not discrete elements of vileness that would require separate proof but rather are "several possible sets of underlying facts [that] make up [the] particular element." <u>Richardson</u>, 526 U.S. at 817, 119 S.Ct. 1707. Neither <u>Clark</u> nor <u>Richardson</u>, therefore, requires juror unanimity on these points.

> Accordingly, we reject this assignment of error.

<u>Jackson</u>, 587 S.E.2d at 541.

As stated by the Respondent, the United States Supreme Court has not extended the holding in <u>Richardson</u> to Virginia's sentencing factors.  Further, the jurors did unanimously agree that the government proved the aggravating factor of vileness beyond a reasonable doubt.  It is reasonable for the Virginia Supreme Court to conclude that the three categories (torture, depravity of mind, and aggravated battery) are different means by which a defendant can commit the element of vileness. Therefore, the holding in <u>Richardson</u> would not require unanimity on the underlying means.  The Virginia Supreme Court's decision was not unreasonable within the meaning of § 2254(d), and Ground (d) should be DENIED.

## G.  Ground (e)

In Ground (e), Jackson argues his trial counsel provided ineffective assistance when he failed to object to the comparative worth argument made by the prosecutor during Jackson's sentencing hearing.  Jackson asserts the argument was so prejudicial that the outcome of the trial was fundamentally unfair.

During sentencing, the prosecutor called four witnesses who testified about the impact of the loss of the victim on the community and the victim's value as a human being.   On page six of the prosecutor's seven-page closing argument,  he stated:

> As I listened to this testimony today, I couldn't help but realize that what we're talking about here are two lives that were completely opposite.  You had Beulah Mae Kaiser who literally during her life lost everything material, just about everything you can lose, and who only sought to give.  She lost what she had and wanted to give more.  Then you have Kent Jackson was given everything and only sought to take more.

(Tr. 868-869.)  Later in the argument, the prosecutor asked the jury to "[w]eigh the life he had against what he has taken, and when you do you will know that the appropriate punishment for capital murder is death." (Tr. 869.)  Finally, the prosecutor summed up by stating, "[l]ook at the two lives.  Go back and think about the two lives, completely near opposite." (Tr. 877.)  Jackson's counsel failed to object to any of these statements.  Jackson argues his counsel was ineffective for failing to object to the prosecutor's comparison of Jackson to the victim, and that he was prejudiced because his trial was fundamentally unfair as a result of the comparison.

The Virginia Supreme Court held that Jackson's claim of ineffective assistance of counsel due to counsel's failure to object to the prosecution's closing argument at sentencing:

> satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in Strickland.  This Court has previously held that "victim impact testimony is relevant to punishment in a capital murder prosecution in Virginia."  Weeks v. Commonwealth, 248 Va. 460, 476, 450 S.E.2d 379, 389-90 (1994).  The record, including the trial transcript, demonstrates that the Commonwealth's comments about the victim and petitioner were based on evidence already in the record.  Petitioner does not argue that the comments, standing alone, were factually inaccurate or unsupported by the record.  Petitioner concedes that the United States Supreme Court approved the use of victim impact evidence in Payne v. Tennessee, 501 U.S. 808 (1991), but argues there is a judicial movement towards

recognizing that the victim impact statements and argument could be "so unduly prejudicial that it renders the trial fundamentally unfair," Id. at 825.  In support of this argument, petitioner asks this Court to consider Humphries v. Ozmint, 366 F.3d 266 (4th Cir. 2004).  The United States Court of Appeals, however, has since vacated that panel opinion and affirmed the judgment of the district court, holding that the South Carolina Supreme Court did not err when it held that the solicitor's comparison of the defendant's life to that of the victim in closing argument during the sentencing phase did not render the trial fundamentally unfair. Humphries v. Ozmint, 397 F.3d 206, 226 (4th Cir. 2005) (en banc) [cert. denied, 126 S.Ct. 128 (2005)].  Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different.

Jackson v. Warden, No. 042706, Order at 17-18.  In considering the instant habeas petition, this Court must determine whether the Virginia Supreme Court unreasonably applied the United States Supreme Court's holding in Payne v. Tennessee, 501 U.S. 808, 819 (1991) to the facts in Jackson's case. 28 U.S.C. § 2254(d)(1).

In 1987, the Supreme Court held in a 5 to 4 vote that the Eighth Amendment prohibits a jury from considering a victim impact statement at the sentencing phase of a capital trial. See  Booth v. Maryland, 482 U.S. 496 (1987).  This holding was extended by South Carolina v. Gathers, 490 U.S. 805 (1989), to statements made by a prosecutor to the sentencing jury regarding the personal qualities of the victims.  The court later explained that the holdings in Booth and Gathers were based on the premise that evidence relating to a particular victim or the harm the capital defendant causes a victim's family do not reflect on the defendant's "blameworthiness," and only evidence relating to "blameworthiness" is relevant to a capital sentencing decision. Payne v. Tennessee, 501 U.S. 808, 819 (1991).  In contrast, the court had also held that a capital defendant was entitled to present "any relevant mitigating evidence" in support of a sentence less than death. Eddings v. Oklahoma, 455

U.S. 104, 114 (1982).

In 1991, the Supreme Court overruled <u>Booth</u> and <u>Gathers</u>, recognizing that the interpretation of the three cases discussed above has "unfairly weighted the scales in a capital trial," by placing few limits on relevant mitigating evidence while barring evidence regarding the victim.  <u>Payne v. Tennessee</u>, 501 U.S. at 822, 830.  The victims in <u>Payne</u> were a young mother, her two-year-old daughter and her three-year-old son.  <u>Id.</u> at 811.  The mother and daughter were stabbed to death with a butcher knife in their apartment, and though several wounds inflicted by the butcher knife penetrated through the body of the son, he survived.  <u>Id.</u> at 811.  During the sentencing phase of the trial, the children's grandmother testified about how her grandson had been affected by the murders of his mother and sister.  <u>Id.</u> at 814.  During closing argument, the prosecutor commented on the effect of the crime on the son and the family, including statements that the little girl would never have the chance to grow up, and that the mother will never be able to kiss her son goodnight.  <u>Id.</u> at 815-16.  He concluded that the defense attorney "wants you to think about a good reputation, people who love the defendant and things about him.  He doesn't want you to think about the people who love [the victims] . . . ."  <u>Id.</u> at 816.  The jury sentenced Payne to death on each of the murder counts, and in affirming the conviction and sentence, the state court rejected Payne's argument that the grandmother's testimony and the prosecutor's closing argument violated his Eighth Amendment rights.  <u>Id.</u>  The Supreme Court granted certiorari, and overruled the holdings in <u>Booth</u> and <u>Gathers</u> that the Eighth Amendment prohibits a capital sentencing jury from considering "victim impact" evidence.  <u>Id.</u> at 817.

The Court noted the defendant's concern that the admission of victim impact evidence permits a jury to find defendants whose victims were assets to their community more deserving of

punishment than defendants whose victims were perceived as less worthy. Id. at 823.  However, the Court admonished "[a]s a general matter, victim impact evidence is not offered to encourage comparative judgments of this kind - for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not." Id. at 823.  The Court held victim impact evidence serves the entirely legitimate purpose of informing the sentencing authority about harm caused by the defendant, while cautioning that "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." Id. at 825 (citing Darden v. Wainwright, 477 U.S. 168, 179-83 (1986)).  However, the Supreme Court did not set the parameters of what type of victim-impact evidence is "so unduly prejudicial that it renders the trial fundamentally unfair" under the Due Process Clause of the Fourteenth Amendment.

In the Fourth Circuit case discussed by the Virginia Supreme Court, Humphries v. Ozmint, the court applied the Payne decision in a habeas context similar to the one here. See Humphries v. Ozmint, 397 F.3d 206 (2005).  Humphries was convicted of capital murder in South Carolina and was sentenced to death. Id. at 208.  During the sentencing phase of his trial, the prosecutor called two witnesses from the victim's family to talk about the victim's childhood, upbringing, work ethic, generosity, and close relationship with his daughter. Id. at 209.  The defense called thirteen witnesses to establish that there was no intent to kill, that Humphries had no significant history of engaging in violent acts, that he had an extensive history of emotional, physical, and substance abuse, and that he was a trustworthy, respectful and pleasant person. Id. at 210.  During closing arguments, the prosecutor discussed the evidence in support of aggravating circumstances, summarized Humphries's "checkered" past, and addressed the evidence presented in mitigation.

Id. at 211-12.  The prosecutor then discussed the victim's uniqueness as an individual,  emphasizing that the victim had come from a very poor background, similar to Humphries's, but was able to become a productive member of the community.   Id. at 212-13.   While outlining the victim's accomplishments, the prosecutor interjected on three occasions with comments about the defendant. Id. at 213.  For instance, the prosecutor commented that in 1986 the victim began building homes in the community where he had grown up, and then contrasts this with, "[t]hat's the same year [the defendant] is up for his second probation violation and sent down to Columbia." Id.   During the conclusion of his closing argument, the prosecutor stated, "When you look at a case like this, when you look at the aggravation, when you look at the total lack of mitigation, I would submit, when you look at the character of this Defendant, and when you look at [the victim], how profane when you look at all the circumstances of this crime and of this Defendant, how profane to give this man a gift of life under these circumstances . . . ." Id. at 214.

During post-trial motions, defense counsel objected to the prosecutor's use of comparisons between the victim and the defendant during closing arguments.   Id. at 214.   The trial court overruled the objection, and the judgment was affirmed on direct appeal.   Id.   Humphries's subsequent application for post-conviction relief in state court was dismissed, by the lower court as well as the South Carolina Supreme Court.   Id. at 215.

Humphries's federal habeas petition was dismissed by the district court, which granted a certificate of appealability.   Id.   A divided panel of the Fourth Circuit vacated Humphries's death sentence; however, a majority of the active circuit judges voted to rehear the case *en banc*. In an *en banc* opinion, the Fourth Circuit affirmed the state court holding while outlining its interpretation of the Payne decision as it applies to victim-to-defendant comparisons.   Id.   The Court reasoned that

the Supreme Court in <u>Payne</u> did not specifically prohibit victim-to-defendant comparisons, and concluded the prosecutor's closing arguments in <u>Humphries</u> did not render sentencing fundamentally unfair. <u>Id.</u> 218-19. The court noted the prosecutor's arguments were based on evidence already in the record, and the similarities and differences between Humphries and the victim were readily apparent to the jury before closing arguments. <u>Id.</u> at 219. The court further noted "<u>Payne</u> does not prohibit character comparisons between defendants and victims; it prohibits comparisons that suggest that there are worthy and unworthy victims." <u>Id.</u>   The court discussed that the prosecutor did not use the words "worth," "comparative worth," or "value" in his argument, and did not invite the jury to return a sentence based on the relative worth of the lives of the victim or Humphries. <u>Id.</u> at 220-21. Moreover, the court found, "we harbor no doubt that, notwithstanding the solicitor's comparison that Humphries finds so objectionable, a sentence of death would have resulted." <u>Id.</u> at 222. The Court concluded the state court's holding that <u>Payne</u> did not prohibit victim-to-defendant comparisons, and that the closing argument did not render the trial fundamentally unfair, was reasonable under § 2254. <u>Id</u> at 225.

The Fourth Circuit distinguished the closing argument in <u>Humphries</u> from the closing argument in <u>Hall v. Catoe</u>, 601 S.E.2d 335 (S.C. 2004), which the South Carolina Supreme Court found rendered the trial fundamentally unfair. In <u>Hall</u>, the solicitor made the following argument, "[w]hat are the lives of these two girls worth? Are they worth the life of this man, the psychopath, this killer who stabs and kills, and rapes and kidnaps." <u>Id.</u> at 339. The Fourth Circuit noted that <u>Hall</u> involved a direct "value" comparison between the defendant and the victim, "asking the jury to weigh the relative worth of the defendant and the victim." <u>Humphries</u>, 397 F.3d at 223. Whereas, the solicitor in <u>Humphries</u> compared the histories of the defendant and the victim based on the

35

evidence presented.  Id.

In Jackson, the prosecutor asked the jury to perform a direct value comparison between the victim and the defendant, instructing the jury to  "[w]eigh the life he had against what he has taken, and when you do you will know that the appropriate punishment for capital murder is death."  (Tr. 869.)  The closing argument in Jackson cannot be persuasively distinguished from the closing argument in Hall where the prosecutor asked the jury to weigh the value of the victims with that of the defendant.  Under the Fourth Circuit's reasoning in Humphries, such a comparison can render a trial fundamentally unfair.

However, to violate due process, an error must be of sufficient significance that it denies the defendant the right to a fair trial.  Greer v. Miller, 483 U.S. 756, 765 (1987). As Justice O'Connor noted in her concurring opinion in Payne, victim impact testimony does not offend due process when it does not inflame the jury "more than . . . the facts of the crime."  Payne, 501 U.S. at 832(O'Connor, J. concurring).  Similarly, in the Humphries opinion, the Fourth Circuit noted, "we harbor no doubt that, notwithstanding the solicitor's comparison that Humphries finds so objectionable, a sentence of death would have resulted."  Humphries, 397 F.3d at 222.  We must consider the prosecutor's closing argument in Jackson in light of all of the evidence presented at the trial.  It was entirely inappropriate for the prosecutor to ask the jury to weigh the value of the victim and the defendant.  Further, Jackson's counsel erred when he failed to object to the argument.  However, in light of the evidence presented regarding the crime – that Mrs. Kaiser died from a combination of a stab wounds to her jugular vein, a fractured skull, and asphyxia caused by blockage of her airway by her tongue; that she suffered two black eyes, a broken nose, and multiple abrasions, lacerations, and bruises; that she had five stab wounds to her head and neck, including the wound

36

to her jugular vein; and, that she had been anally sodomized with her walking cane and that the cane then had been driven into her mouth with such violence that it knocked out most of her teeth, tore her tongue and forced it into her airway, fractured her jaw, and penetrated the left side of her face – it cannot be said that the prosecutor's argument asking the jury to "[w]eigh the life he had against what he has taken," (J.A. 1298), would "inflame" the jury more than the facts of the crime.

This consideration must be coupled with the fact that this Court is bound by the deference standard of § 2254(d), and is not making a determination of whether the state acted correctly, but rather whether the Virginia Supreme Court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as established by the Supreme Court of the United States." "[A]s the statutory language makes clear, . . . § 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." Williams v. Taylor, 529 U.S. 362, 412 (2000). While the Fourth Circuit in Humphries has insinuated direct victim to defendant comparisons like the one made by the prosecutor in Jackson's case can render a trial fundamentally unfair, the Payne decision nowhere prohibits victim to defendant comparisons, and nowhere outlines what type of comparison is so prejudicial as to render the trial fundamentally unfair under the Eighth Amendment.  Moreover, other applicable Supreme Court cases similarly stand for general propositions: "[a] prosecutor's argument violates due process if it 'infect[s] the trial with unfairness,'" Darden v. Wainwright, 477 U.S. 168, 181 (1986)); the Eighth Amendment requires that a jury not be precluded from exercising its discretion, Zant v. Stephens, 462 U.S. 862, 879 (1983); and, there is a need for "an individualized decision-making process" so that a death sentence will pass constitutional muster, Jones v. United States, 527 U.S. 373, 381 (1999); Buchanan v. Angelone, 522 U.S. 269, 274-75 (1998); Romano v. Oklahoma, 512 U.S. 1, 7 (1994); Harmelin

v. Michigan, 501 U.S. 957, 995 (1991).  The Supreme Court has held that "[t]he more general the rule, the more leeway [state] courts have in reaching outcomes in case by case determinations." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  This Court must determine whether the Virginia Supreme Court's decision fits within the overall "matrix" of the United States Supreme Court's prior decisions.  Id. at 2150; see Mitchell v. Esparza, 540 U.S. 12, 17 (2003) (per curiam) ("[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from this Court is, at best, ambiguous."); Lockyer v. Andrade, 538 U.S. 63, 76 (2003) (holding where the "precise contours" of Supreme Court law were "unclear," state court decision was not unreasonable).

It is questionable whether any court's finding that a prosecutor's closing argument in a capital case violates clearly established federal law, since the United States Supreme Court has not outlined which arguments violate due process.  The Supreme Court has granted certiorari to decide this issue in Roper v. Weaver, 127 S. Ct. 763 (2006).  As the Supreme Court has not addressed the claim that a prosecutor's comparison of the defendant to the victim is so inherently prejudicial as to deprive the defendant of a fair trial, it cannot be said that the Virginia Supreme Court "unreasonabl[y] appli[ed] clearly established Federal law" when it denied Jackson's ineffective assistance of counsel claim.  See Carey v. Musladin, 127 S.Ct. 649, 654 (2006) (citing 28 U.S.C. § 2254(d)(1)).  Therefore, while Jackson's counsel failed the performance prong of the Strickland test when he failed to object to the prosecutor's closing argument, Jackson cannot prove he was prejudiced as a result, and Ground (e) should be DENIED.

## H.  Ground (f)

In Ground (f), Jackson argues the Virginia Supreme Court erred when it ruled that (i) the

Virginia capital murder statutes are constitutional, and (ii) Jackson's sentence was not disproportionate or excessive.  Jackson contends he was sentenced to death under a system that imposes death in an "arbitrary and capricious manner, in violation of his rights to due process of law under the Fourteenth Amendment and the holding in <u>Furman v. Georgia</u>, 408 U.S. 238 (1972)." (Pet. 78.)  For death penalty statutes to be found constitutional, the Supreme Court has stressed the importance of post-conviction review to ensure that juries do not "wantonly and freakishly impose the death sentence."  <u>Gregg v. Georgia</u>, 428 U.S. 153 (1976).

Virginia Code § 17.1-313 provides for automatic review of all death penalty sentences under 17.1-313(A), even if the defendant waives his right of appeal.  The Virginia Supreme Court must consider and determine:

> 1. Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and
> 2. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and defendant.

Va. Code § 17.1-313(C)(1) and (2) (1998).  Having conducted a proportionality review, the Virginia Supreme Court found that Jackson's sentence was not the result of passion or prejudice and was not disproportionate.  <u>Jackson</u>, 587 S.E.2d at 545-46.

Jackson argues that the Virginia Supreme Court does not conduct a review of all similar cases because the Virginia Supreme Court only reviews those cases that are appealed to it.  This is significant he argues, because cases involving a death sentence are automatically appealed to the Virginia Supreme Court, whereas cases in which a life sentence is imposed may not be appealed, or may only be appealed to the Virginia Court of Appeals.  <u>See</u> Va. Code § 17.1-406(A)(i) (2003). In a pretrial motion, Jackson moved to declare Virginia's capital murder and death penalty statutes

unconstitutional because they fail to provide meaningful appellate review consistent with the requirements of the Sixth, Eighth or Fourteenth Amendments to the United States Constitution. (J.A. 311, 58-62.)  The motion was denied by the trial court.  (J.A. 157-58, 247.)  On direct appeal, the Virginia Supreme Court affirmed the ruling of the trial court, holding that the issue was previously decided.  Jackson v. Commonwealth, 587 S.E.2d 532, 538-39 (2003) (citing Satcher v. Commonwealth, 421 S.E.2d 821, 826 (Va. 1992)).

Respondent asserts this substantive claim has never been submitted to the Virginia Supreme Court, but that instead Jackson argued in his state habeas petition that counsel was ineffective for failing to make the argument.  Respondent is correct that Jackson did not fairly present this argument to the Virginia Supreme Court in his state habeas petition.[9]  However, in his direct appeal, Jackson included an assignment of error that the trial court erred in refusing to declare Virginia's capital murder statutes unconstitutional because, among other reasons, they "fail to provide meaningful

---

[9] In Claim XIII of Jackson's state habeas petition, he alleges, "trial counsel failed to adequately challenge the unconstitutional character of the death penalty in Virginia." (State Petition 34.)  Following his briefing of thirteen ineffective assistance of counsel claims, Jackson states,

> [t]o the extent that Petitioner's previous claims of ineffective assistance of counsel have argued that Petitioner's Trial Counsel of [sic] Appellate Counsel failed to protected [sic] rights guaranteed to him by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, Petitioner by this reference also makes his claim for relief based on the direct violations of his said constitutionally protected rights, as well as to the violations of his right to effective assistance of counsel through his counsel's failure to protect them, as previously set forth.

(State Petition 39.)  Including such a summary statement in a habeas petition is not a fair presentation of the substance of the claim sufficient to meet the exhaustion requirement.  See Picard v. Connor, 404 U.S. 270, 276 (1971); Keeney v. Tamayo-Reyes, 504 U.S. 1, 9-10 (1992); Mallory v. Smith, 27 F.3d 991, 994 -995 (4th Cir. 1994).

appellate review of proportionality and passion/prejudice in violation of . . . the 5th, 6th, 8th and 14th Amendments to the United States Constitution . . . ."  (Br. of Appellant 36, July 2, 2003.) Therefore, Jackson has exhausted the claim.

Basically, Jackson's claim is that the proportionality review performed by the Virginia Supreme Court is unconstitutional, because it does not include *all* similar cases.  It is important to note that proportionality review is not required by the United States Constitution.  See Pulley v. Harris, 465 U.S. 37, 44-45 (1984) ("[t]hat some schemes providing proportionality review are constitutional does not mean that such review is indispensable . . . . Examination of our [prior] cases makes clear that they do not establish proportionality review as a constitutional requirement.") Rather, proportionality review is entirely a creature of statute.  See Winston v. Commonwealth, 604 S.E.2d 21, 53 (Va. 2004).

The Virginia Supreme Court has explained in detail how the proportionality review it conducts complies with Virginia Code § 17.1-313.  See Bailey v. Commonwealth, 529 S.E.2d 570, 580-81 (Va. 2000).  The Virginia Supreme Court also addressed Jackson's concerns about the cases excluded from the proportionality review, explaining,

> [a]lthough Bailey offers no supporting authority for the proposition that these records are incomplete, we recognize that a small number of defendants convicted of capital murder and sentenced to life imprisonment waive their right of appeal and, thus, records of those cases are not included in the archive maintained by this Court pursuant to Code § 17.1-313(E). However, we are of opinion that such cases almost invariably involve guilty pleas and the Commonwealth's agreement not to seek the death penalty. Thus, their value for making a proportionality analysis is minimal because the record would contain little or no background upon which to make the proportionality comparison.

Bailey v. Commonwealth, 529 S.E.2d at 580 n. 3.

In reviewing Jackson's claim, the Court is constrained by the § 2254(d) deferential standard of review.  The Supreme Court cases require post-conviction review to ensure that juries do not "wantonly and freakishly impose the death sentence."  Gregg v. Georgia, 428 U.S. 153 (1976).  In Gregg v. Georgia, the petitioner made an argument similar to the one Jackson makes here, that Georgia's proportionality review is unconstitutional because "nonappealed capital convictions where a life sentence is imposed and cases involving homicides where a capital conviction is not obtained are not included in the group of cases which the Supreme Court of Georgia uses for comparative purposes."  428 U.S. at 205.  The Supreme Court held the argument did not establish that Georgia's review process was ineffective or unconstitutional.  Id.  In light of this holding, it cannot be said that the Virginia Supreme Court's adjudication in Jackson "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as established by the Supreme Court of the United States."  28 U.S.C. § 2254(d).  Therefore, Jackson's Ground (f)(i) should be DENIED.

In Ground (f)(ii), Jackson argues the Virginia Supreme Court erroneously found that his sentence was not proportionate or excessive because his co-defendant's sentence was not considered when the court conducted its proportionality review.  Jackson's co-defendant pled guilty to murder and accepted a lengthy term of imprisonment.  Jackson's co-defendant had not been convicted or sentenced at the time the Virginia Supreme Court conducted its proportionality review.  (Pet. Reply 23-24.) Jackson did not present this argument to the Virginia Supreme Court, and the facts that form the basis of this argument were not presented to the court in support of his alternative legal arguments.

Because this argument was not presented to the Virginia Supreme Court, it is procedurally

defaulted and this Court is precluded from addressing the merits of the claim.  28 U.S.C. § 2254(b) (2000).  The Virginia Supreme Court would now find the claim procedurally barred pursuant to Section 8.01-654(B)(2) of the Virginia Code, which bars petitioners from "raising any claim in a successive petition if the facts as to that claim were either known or available to petitioner at the time of his original petition." Procedural default may be excused, however, if the petitioner "can demonstrate cause for, and resulting prejudice from, the default, or that he has suffered a fundamental miscarriage of justice." Fisher, 163 F.3d at 852; see also Wainwright v. Sykes, 433 U.S. 72, 87-91 (1977).  Nowhere in his federal petition has Jackson shown the requisite cause and prejudice that this Court must find before considering the merits of the claim. Therefore, Ground (f)(ii) is procedurally defaulted, and this Court is precluded from addressing the merits of the claim. 28 U.S.C. § 2254(b) (2000).

Jackson further points out that the mandatory language of Virginia Code § 17.1-313(E) requires the Virginia Supreme Court to provide the circuit courts with the records of the capital felony cases that come before the Court.  Jackson attached an affidavit from a West Virginia attorney relating information obtained from an unidentified deputy clerk at the Virginia Supreme Court stating no records are available in the Newport News Circuit Court.  (Pet. App. Tab No. 4.) Jackson did not present this argument, or the affidavit, to the Virginia Supreme Court.  Therefore, this Court finds that Jackson's argument regarding the availability of records in the Newport News Circuit Court is defaulted on federal habeas and will not address the merits.  28 U.S.C. § 2254(b) (2000).

### III.   RECOMMENDATION

For the foregoing reasons, the Court recommends that Jackson's petition for writ of habeas

43

corpus be DENIED and the Respondent's motion to dismiss be GRANTED.

Jackson's Grounds (a)(i), (a)(iii), (b)(ii), (b)(iii), (c), (d), (e), and (f)(i) should be DENIED because they were previously adjudicated by the Virginia Supreme Court on the merits and none of the statutory exceptions apply that would allow this Court to review the claims on the merits.

Jackson's Ground (a)(ii) and (f)(ii) should be DENIED because they were never raised to the Virginia state courts and Jackson has shown no cause for failing to present the claim and no prejudice resulting therefrom which this Court must find before considering the merits of the claim.

Jackson's Ground (b)(i) should be DENIED because it was procedurally barred from review in the state courts and thus, may not now be considered in this federal Court.

Jackson's request for an evidentiary hearing is hereby DENIED.

Jackson has failed to demonstrate "a substantial showing of the denial of a constitutional right" therefore, it is recommended that the Court decline to issue any certificate of appealability pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure. See Miller-El v. Cockrell, 537 U.S. 322 (2003).

## IV. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within ten (10) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules. A party may respond to another party's objections within ten

(10) days after being served with a copy thereof.

2. A district judge shall make a <u>de novo</u> determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of right to appeal from a judgment of this court based upon such findings and recommendations.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Carr v. Hutto</u>, 737 F.2d 433 (4th Cir. 1984); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).


_____/s/_____
Tommy E. Miller
UNITED STATES MAGISTRATE JUDGE


Norfolk, Virginia
January 16, 2007

45

## CLERK'S MAILING CERTIFICATE

A copy of the foregoing Report and Recommendation was mailed this date to the following:


Andrew Anthony Protogyrou, Esq.
Protogyrou & Rigney PLC
215 East City Hall Avenue
PO Box 3205
Norfolk, VA 23510

Marvin David Miller, Esq.
1203 Duke Street
The Gorham House
Alexandria, VA 22314

Michele Jill Brace, Esq.
Virginia Capital Representation Resource Center
2421 Ivy Road
Suite 301
Charlottesville, VA 22903

Steven Andrew Witmer, Esq.
Office of the Attorney General
900 East Main Street
Richmond, VA 23219


                                    Fernando Galindo, Acting Clerk



                        By _____
                             Deputy Clerk

                             January      , 2007

46